UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) CAUSE NO. 2:07 CR 56 |
| | ) |
| DR. JIHAD KASIM | ) |

OPINION AND ORDER

The defendant, Jihad Kasim, was a board certified pediatrician who enjoyed an excellent reputation with his patients and his colleagues.  In 2002 and 2003, Kasim engaged in extensive Medicaid fraud by submitting inflated claims which exceeded $1 million.  For some unknown reason, the fraud went undetected, and no criminal charges were filed.  Kasim also gambled heavily during that two year period.

On July 26, 2003, Kasim suffered a near fatal heart attack and remained in a coma for almost one week.  While in the hospital, Kasim also was diagnosed with sleep apnea.  On August 11, 2003, Kasim was discharged from the hospital.

In November 2003, Kasim returned to work with the approval of his treating physician.  This included his private practice and treating patients at two hospitals, Broadway Methodist in Indiana and Provident in Illinois.  As a board certified pediatrician, Kasim was required to take regular continuing medical educational courses and pass a re-certification examination.  On April 6, 2007, Kasim passed the re-certification examination conducted by the American Board of Pediatrics.

In 2004, Kasim resumed his gambling and his fraudulent billing practices. Once again, Kasim submitted fraudulent claims over a two year period totaling another $1 million. This time, the fraud did not go undetected, and the grand jury returned an indictment on April 18, 2007. A superseding indictment was returned on August 16, 2007.

When Kasim appeared for the arraignment on the superseding indictment on September 6, 2007, his attorney, Daniel Purdom, suggested that Kasim was not competent to assist in his defense. On December 13, 2007, a motion was filed addressing the competency issue. A second motion was filed on May 16, 2008.

Both the government and Purdom retained medical experts to examine Kasim on the issue of competency. A hearing began on July 29, 2008 but was not completed due to the voluminous medical evidence. After five days of evidence, the hearing was completed on September 22, 2008. The court also heard final arguments from the attorneys on October 14, 2008.

### Medical Terms[1]

**Anoxic encephalopathy:** permanent brain damage with severe impairment of consciousness and mental abilities caused by cessation of oxygen delivery to the brain.

**Clinical psychology:** scientific study and application of psychology for the purpose of understanding, preventing, and relieving psychologically-based distress or dysfunction and to promote

---

[1]This glossary of terms is not meant to be exhaustive as to each term, but to be a simplified summary of the medical terminology pervasive in the records and testimony. Unless otherwise cited, these definitions are common, readily-available definitions, definitions explained in the exhibits and evidence before the court, or summaries of extensive available definitions found in such sources as WebMD.com, Mayo Clinic online medical information, RightHealth online reference guide, and other legitimate online medical information sources.

subjective well-being and personal development.  Often confused with psychiatry, which generally has similar goals, clinical psychology is unique in multidisciplinary approach to complex patient problems.  Patient assessments a conducted through various intelligence and achievement, personality, and neuro-psychological tests, as well as through clinical observations of patient behavior, mood and affect, perception, comprehension, orientation, insight, memory, and content of communication.

**Coma:**  unarousable unresponsiveness; in deep coma, even primitive avoidance reflexes may be absent.

**Co-morbidity:**  the presence of one or more disorders or diseases in addition to a primary disease or disorder; a dual diagnosis; description of the effect of other diseases other than the primary disease of interest.

**Confabulate:**  aka, **false memory;** the confusion of imagination with memory, and/or the confusion of true memories with false memories; can result from both organic and psychological causes.

**Continuous Positive Airway Pressure (CPAP):**  a method of respira-tory ventilation used primarily in the treatment of sleep apnea, for which it was first developed; also commonly used for criti-cally ill patients in hospital with respiratory failure.  A CPAP machine is used by patients for treatment of sleep apnea at home. The CPAP machine stops the narrowing of the upper airway muscles during sleep by delivering a stream of compressed air via a hose to a nasal pillow or mask so that unobstructed breathing becomes possible, reducing and/or preventing apneas and hyponeas.

**CT scan (aka CAT scan; Computerized Axial Tomography scan):**  an x-ray procedure which combines many x-ray images with the aid of a computer to generate cross-sectional views and, if needed, three-dimensional images of the internal organs and structures of the body; used to define normal and abnormal structures in the body and/or assist in procedures by helping to accurately guide the placement of instruments or treatments.  CT scans are per-formed to analyze the internal structures of various parts of the body, including the head for traumatic injuries, and for tumors and infections.

**Dementia:**  a structurally caused permanent or progressive decline in several dimensions of intellectual function that interferes substantially with the individual's normal social or economic activity.

**Etiology and Classification:** include Static dementia, Alzheimer-type dementia, Multi-infarct dementia, Chronic communicating hydrocephalus with "normal" pressure, or Chronic progressive traumatic encephalopathy (caused by severe head injury).

**Symptoms, Signs, and Course:** depression, paranoia, anxiety, or any of several other psychologic symptoms may be the predominant presenting feature. Early symptoms differ widely from patient to patient. The most common clinical picture is slow disintegration of personality and intellect due to impaired insight and judgment and loss of affect. . . .

In some patients, cognitive dysfunction is preceded by modifications in their usual behavior and emotional responses. Typically, affect is blunted, but in early stages it may be excessive. . . .

**Diagnosis:** Diagnosis is a matter of clinical judgment. A neuropsychologic diagnosis of dementia should *not* be accepted if the clinical evaluation is dubious, especially in patients who appear depressed or who may have other primary psychiatric disorders. Psychometric test results can be depended on only when the patient is freely communicative. Muteness or a failure to supply complete answers can result from depression as easily as from dementia. CT studies also should be correlated with the clinical state. Cerebral cortical "atrophy" increases with age in persons with normal mental status, and CT scan provides no reliable indication of intellectual impairment. The EEG is almost always pathologically slow in organic dementia.

*The Merck Manual of Diagnosis and Therapy*, 1336-38 (Robert Berkow, M.D., & Andrew J. Fletcher, M.B., eds., 1987).


**EEG (electroencephalogram):** a test during which the electrical signals of the brain are recorded. The electrical activity is detected by electrodes placed on the patient's scalp and transmitted to a polygraph that records the activity. Often used to detect epilepsy or diagnose sleep disorders and other diseases of the nervous system.

**Frontal lobe:** area of the brain located at the front of each cerebral hemisphere; play an important part in retaining longer term memories which are not task-based.

**Frontotemporal Dementia (FTD):** an umbrella term for a diverse group of rare disorders that primarily affect the frontal and temporal lobes of the brain – the areas generally associated with personality and behavior. In FTD, portions of these lobes atrophy or shrink. Signs and symptoms vary, depending upon the portion of the brain affected. Some people with frontotemporal dementia undergo dramatic changes in their personality and become socially inappropriate, impulsive or emotionally blunted, while others lose the ability to use and understand language. FTD is often misdiagnosed as a psychiatric problem or as Alzheimer's disease. But FTD tends to occur at a younger age than does Alzheimer's disease, typically between the ages of 40 and 70, and the memory problems associated with Alzheimer's disease are not as prominent in the early stages of FTD.

**MRI (Magnetic Resonance Imaging):** a radiology technique that uses magnetism, radio waves, and a computer to produce images of body structures. The MRI scanner is a tube surrounded by a giant circular magnet. The patient is placed on a moveable bed that is inserted into the magnet. The magnet creates a strong magnetic field that aligns the protons of hydrogen atoms, which are then exposed to a beam of radio waves. This spins the various protons of the body, and they produce a faint signal that is detected by the receiver portion of the MRI scanner. The receiver information is processed by a computer, and an image is produced. The image and resolution produced by MRI is quite detailed and can detect tiny changes of structures within the body. For some procedures, contrast agents are used to increase the accuracy of the images. An MRI scan can be used as an extremely accurate method of disease detection throughout the body. In the head, trauma to the brain can be seen as bleeding or swelling. Other abnormalities often found include brain aneurysms, stroke, tumors of the brain, as well as tumors or inflammation of the spine.

**Neuroradiology:** radiologic subspecialty focusing on the diagnosis and characterization of abnormalities of the central and peripheral nervous system, spine, and head and neck. Primary imaging modalities include CT scan and MRI.

**Nuclear Medicine:** a branch of medicine and medical imaging that uses the nuclear properties of matter in diagnosis and therapy. Nuclear imaging produces images that reflect biological processes that take place at the cellular and subcellular level.

**Neurologist:** medical specialist dealing with disorders of the nervous system.

**Neuropsychiatrist:** medical specialist dealing with mental disorders attributable to diseases of the nervous system.

**Neuropsychologist:** specialist of interdisciplinary branch of psychology and neuroscience that aims to understand how the structure and function of the brain relate to specific psychological processes and overt behaviors.

**Neurosurgeon:** one who performs surgery of the brain or other nerve tissue

**PET (Positron Emission Tomography):** a type of nuclear medicine imaging; measures functions such as blood flow, oxygen use, and glucose metabolism in evaluations of organ and tissue function; often used in combination with CT scans to pinpoint location of abnormal metabolic activity within the body.

**SSEP(Steady-State Evoked Potential):** an electrical potential recorded from central nervous system structures following presentation of a stimulus, here, a steady-state or repetitive sensory stimulation.

**Sleep apnea:** a potentially lethal disorder in which breathing stops during sleep for ten seconds or more, sometimes more than 300 times per night; can be **obstructive** (upper airway blockage despite airflow drive), **central** (decreased respiratory center output), or **mixed.**

**SPECT (Single Photon Emission Computed Tomography):** a technique for measuring brain function similar to PET; a nuclear medicine procedure in which a gamma camera rotates around the patient and takes pictures from many angles, which a computer then uses to form a cross-sectional image. The calculation process in SPECT is similar to that in CT (x-ray computed tomography) and in PET (positron emission computed tomography).

**Temporal lobes:** parts of the cerebrum that are involved in speech, memory, and hearing; lie at the sides of the brain. Visual recognition, auditory perception, memory, and emotion are critically served by temporal lobe structures.

**TOMM test (Test of Memory Malingering):** a commonly used test to determine malingering. Others include Computerized Assessment of Response Bias (CARB) and Minnesota Multiphasic Personality Inventory (MMPI).

## Findings of Fact

1.   Kasim was born in Jordan on September 14, 1957, and came to the United States in 1983.

2.   Beginning in 1990, Kasim worked as a pediatrician in Michigan, Texas, Illinois, and Indiana. Kasim ended his practice in 2007.

3.   In 2002 and 2003, Kasim engaged in extensive Medicaid fraud by submitting inflated claims which exceeded $1 million. The fraud was not detected, and no criminal charges were filed.

4.   During this same time period, Kasim gambled heavily. A search of his residence on April 11, 2007, revealed receipts for cash withdrawals from ATMs placed at local casinos. During 2002 and 2003, Kasim withdrew approximately $300,000 according to the receipts.

5.   On July 26, 2003, Kasim went to the Porter Memorial Hospital Emergency Room complaining of chest pains. While being examined in the cardiac unit, Kasim suffered a myocardial infarction and was clinically dead for a brief period of time.

6.   Although the medical experts disagreed on the exact length of time, Kasim was in a coma for at least four days.

7. On July 29, 2003, while still in a coma, Kasim was diagnosed with anoxic encephalopathy caused by an acute myocardial infarction.

8. On July 30, 2003, an EEG was performed with an abnormal result. However, a normal EEG was recorded on August 6, 2003.

9. On August 6, 7, and 9, 2003, the results of a brain MRI were normal.

10. Kasim was discharged on August 11, 2003. The discharge summary included a secondary diagnosis as "anoxic brain damage."

11. While in the hospital, Kasim was diagnosed with Obstructive Sleep Apnea based upon a sleep study. A CPAP was prescribed, and a second study indicated that it provided a significant benefit. Kasim was instructed to use the CPAP every night.

12. In November 2003, Dr. Fred Harris, Kasim's treating physician, released him to return to work. In addition to his private practice, Kasim was on the staff of Broadway Methodist Hospital in Indiana and Provident Hospital in Illinois.

13. Beginning in 2004, Kasim resumed his fraudulent billing practices. According to the superseding indictment, Kasim submitted bills both for patients he did not treat and for services he did not render.

14. Once again, records obtained during the search of Kasim's home on April 11, 2007, revealed another $300,000 in cash withdrawals from casino-based ATMs during 2004 and 2005.

15.   On June 30, 2006, Kasim was notified of an audit of his billing practices.  On July 20, 2006, Kasim was informed that there was a record review scheduled for July 24, 2006.  Kasim told the agent that he was experiencing medical problems and would not be available for two or three weeks.  The agent told Kasim that his presence was not required at the audit.

16.   On July 24, 2006, Kasim called an ambulance and complained of chest pains.  When the ambulance arrived, Kasim requested that the paramedics transport him to Hobart Mercy Hospital.  Because Porter Memorial was the closest hospital, the paramedics refused to transport Kasim to Hobart Mercy.

17.   After being transported to Porter Memorial Hospital, Kasim left and refused to sign a form indicating that he was leaving the hospital against medical advice.

18.   On July 29, 2006, Kasim went to see Dr. Mahmood Alnahass, a neurologist.

19.   In the "history" section of his notes, Dr. Alnahass indicated that Kasim complained of "forgetfulness" and that he was required to write everything down.

20.   In the "medical history" section, Dr. Alnahass noted that Kasim had suffered a heart attack, suffered from sleep apnea, and suffered from anxiety and depression.

21.   The records indicate that Dr. Alnahass conducted a complete neurological examination of Kasim.  In the "language"

section, Dr. Alnahass noted that Kasim was having "word-finding difficulty."

22.   Under the "impression" section, Dr. Alnahass noted a "seemingly significant cognitive dysfunction," but he could not determine whether it was caused by the heart attack or some other source.

23.   In the "plan" section, Dr. Alnahass wrote that he advised Kasim "strongly to avoid practicing medicine at least for the time being."  This section also indicated that Dr. Alnahass wanted to obtain more information from Kasim's "significant other."

24.   The government retained Diana Goldstein, who has a doctorate in clinical psychology, to examine Kasim.  In her report, Dr. Goldstein stated that "Dr. Alnahass rendered no diagnosis, noting his impressions only."

25.   In conducting his examination of Kasim, Dr. Alnahass completed an office form consisting of 10 pages.  The form contains a section labeled "impression," but it does not contain a section marked "diagnosis."  To the extent that Dr. Goldstein concluded that Dr. Alnahass did not reach a diagnosis, her opinion is rejected.

26.   On August 31, 2006, Dr. Alnahass saw Kasim for a second time.  Laura Etienne, Kasim's then fiancee, also was present for the appointment.  Because all of the neurological examinations

ordered by Dr. Alnahass were normal, he recommended that Dr. Kasim undergo another sleep study.

27.   Kasim did not undergo the second sleep study until May 8, 2007.  He never returned to Dr. Alnahass for any follow-up examination or treatment.

28.   As a board certified pediatrician, Kasim was required to take continuing medical courses and pass a re-certification examination.  On April 6, 2007, Kasim passed the re-certification exam.

29.   Various medical experts were questioned concerning Kasim's ability to pass the re-certification exam and how this related to a diagnosis of dementia. The medical experts, who were not board certified pediatricians, had no experience with the examination that Kasim passed.  However, there was general agreement that the exam would include materials covering recent developments in pediatrics along with areas covering routine problems and that a number of the questions were multiple choice. Because the results of the examination were not made available to Kasim nor subpoenaed by either party, it cannot be determined how well Kasim performed on the exam.

30.   On May 8, 2007, Kasim underwent the second sleep study. Compared to the study conducted at Porter Memorial Hospital following his heart attack, it was determined that his sleep apnea had worsened.

31.   On August 28, 2007, Kasim saw Dr. Norman Kohn, a neurologist and a neuropsychiatrist.   Dr. Kohn is board certified in neurology.   Before the initial examination, Dr. Kohn was not contacted by Kasim's attorney, and he did not see a copy of the indictment until after his evaluation.

32.   Dr. Kohn described his initial telephone call from Kasim as rambling and difficult to understand.   He told Kasim that he would have to come to the office for an examination.

33.   Dr. Kohn conducted his initial evaluation of Kasim over a two day period, August 28 and 30, 2007.   On the first visit, Dr. Kohn performed a routine neurological examination which lasted one hour.   Dr. Kohn also talked to Etienne and her children to get information on their relationships with Kasim.

34.   Based upon his telephone conversation with Kasim scheduling the initial appointment, his examination of Kasim, and interviewing family members, Dr. Kohn concluded that Kasim was suffering from dementia.

35.   During his consultation with Kasim, Dr. Kohn advised Kasim not to practice medicine.   Dr. Kohn was so concerned about Kasim practicing in his impaired mental state that he consulted with an attorney to determine whether he had a duty to report his findings to the State Medical Association.   Dr. Kohn determined that he was not required to report his findings.

36. According to Dr. Kohn, patients frequently provide inaccurate information to a doctor. It then becomes the responsibility of the doctor to determine what information is accurate.

37. Kasim did not return to see Dr. Kohn after the initial two day examination.

38. Prior to his testimony at the competency hearing, Dr. Kohn reviewed all of the medical records including the report of Dr. Goldstein. Dr. Kohn testified that the results of later examinations and testing did not change his opinion.

39. Dr. Kohn also reviewed the medical records of Dr. Alnahass, including his "impression" of "seemingly significant cognitive dysfunction." Dr. Kohn interpreted this to be a diagnosis of dementia.

40. Dr. Kohn described dementia as a progressive disease, and he could not determine when it first affected Kasim. According to Dr. Kohn, Kasim may have experienced the onset of dementia prior to his heart attack, but the problems may have become more noticeable after the heart attack. Because dementia is a progressive disease, there is no treatment or prospect of recovery.

41. According to Dr. Kohn, Kasim has frontal lobe dementia. This affects his judgment and his ability to concentrate.

42. Dr. Kohn was "astonished" that Kasim passed the recertification examination. However, he indicated that frontal

lobe dementia does not affect preserved memory and that this may have accounted for Kasim passing the exam.

43. Dr. Kohn also testified that Kasim was paranoid, and he attributed this to the dementia. The paranoia was caused by Kasim's poor judgment and his inability to understand that his attorney, his doctors, and his family were attempting to help him.

44. On November 14, 2007, a brain SPECT scan was performed on Kasim. The scan demonstrated a marked decrease in the blood flow to the front temporal lobes of Kasim's brain. These areas control the cognitive, memory, and speech functions.

45. After reviewing the SPECT scan, Dr. Kohn believed that it supported his original diagnosis of dementia.

46. Dr. Kohn and the other medical experts testified concerning the difference between structural and functional damage to the brain. Tests such as the MRI, EEG, and CT scan are designed to detect structural damage to the brain. The SPECT scan measures the functional capacity of the brain.

47. According to Dr. Kohn, the SPECT scan is a valid test for diagnosing dementia at its early stages.

48. Dr. Kohn testified that a patient can have structural damage to the brain and not have dementia or any other functional problems. Also, a patient can have a functional impairment without having any detectable structural damage. Because of

this, a SPECT scan can be positive for a functional impairment while an MRI may not reveal any structural damage.

49.  Dr. Kohn also testified concerning the effects of sleep apnea on Kasim.  The evidence suggested that Kasim was not using his CPAP and that this caused daytime drowsiness.  Dr. Kohn stated that sleep apnea would not affect the frontal lobes of the brain.  However, exhaustion may affect Kasim's ability to concentrate, which in turn, may affect his memory and the test results.

50.  In her report, Dr. Goldstein concluded that the SPECT results may have been affected by sleep apnea.  She also stated that Kasim's cognitive and memory problems were related to his sleep apnea.

51.  To the extent that there is a conflict between the opinions of Dr. Kohn and Dr. Goldstein, the opinion of Dr. Kohn is accepted.  Dr. Kohn is a medical doctor, the SPECT scan is a test within his medical expertise, and his opinions are supported by other medical testimony in the record.

52.  Based upon his diagnosis of frontal lobe dementia, Dr. Kohn concluded that Kasim does not have the ability to understand the criminal charges and to assist in his defense.  Because of his dementia, Kasim cannot rationally consider the evidence against him and formulate his thoughts to his attorney.

53.  In Dr. Kohn's opinion, Kasim's impaired cognitive abilities led to a poor effort on the various psychological exams.  Even though Kasim was instructed by his attorney

and his family to cooperate in the testing, his dementia pre-
cluded him from following that advice.

54.   Dr. Kohn considered and rejected the suggestion that
Kasim has been malingering.  According to Dr. Kohn, Kasim would
have to be a "consummate actor" to write a script for malingering
and to perform the role for so many years before doctors, attor-
neys, family, and friends.

55.   On October 16, 2007, Kasim was examined by David Hartman
who has a doctorate in neuropsychology.  Dr. Hartman did not
testify at the competency hearing, but his letter dated October
24, 2007 to Purdom was admitted into evidence.

56.   Dr. Hartman reviewed Kasim's medical history and per-
formed a neuropsychological examination.  Kasim informed Dr.
Hartman that he was working "intermittently" and that he was
having memory problems.

57.   In his report, Dr. Hartman stated:

> If the evaluation shows patterns of exaggera-
> tion, then the claimant cannot be relied upon
> to produce a neuropsychologically accurate
> depiction of strengths and weaknesses.  If
> test results are demonstrated to be exagger-
> ated, they cannot be used to infer brain-
> based or personality-based impairment.
>
> Unfortunately this was the case for Dr. Ka-
> sim's test results, which showed highly unre-
> alistic levels of performance that would not
> have been characteristic of patients with his
> medical history.  Repeated demonstration of
> invalid and exaggerated test results demon-
> strated intent to magnify deficit.  It does
> not eliminate the possibility of an underly-
> ing disorder but prevents neuropsychological

test results from being interpreted as clinical indications of impairment.

58. Dr. Hartman stated that the exaggerated test results "may be related to impaired activity in the frontal and prefrontal regions of the brain" or "simply the response pattern of an individual who wishes to appear impaired for secondary gain . . . ." In order to resolve that issue, Dr. Hartman suggested that Kasim undergo functional brain imaging, either a SPECT or a PET scan.

59. Dr. Hartman concluded his report:

> If there is significant impairment in SPECT or PET scan in these regions, this would be consistent with cerebrovascular disease and could be considered a mitigating factor in explaining Dr. Kasim's behavior, including the very poor judgment involved in producing repeatedly exaggerated neuropsychological test results in the current evaluation. Alternatively, if these regions are judged to be intact, then Dr. Kasim's exaggeration must be considered a deliberate attempt to malinger impairment.

60. During her testimony, Dr. Goldstein commented on the procedures and opinions of the other doctors who evaluated Kasim. In particular, she testified that she "applauds" Dr. Hartman for his methodology and his conclusions.

61. On November 7, 2007, Dr. Steven Best, a neuropsychiatrist, examined Kasim at the request of Dr. Hartman.

62.  Dr. Dan Pavel is an associate of Dr. Best and is board certified in nuclear medicine.  On November 14, 2007, Dr. Pavel performed the SPECT scan on Kasim.

63.  According to Dr. Pavel, after he performed the SPECT scan, he informed Dr. Best of the results.  Although Dr. Pavel may suggest a diagnosis in a particular case, Dr. Best must make the final decision.

64.  Prior to the SPECT scan, chemicals are injected into the body of the patient.  With the aid of the chemicals, the blood flow to the different regions of the brain can be measured.  Because of this, the SPECT scan is an objective test.

65.  Both Dr. Best and Dr. Pavel agreed that the SPECT scan was a reliable test to measure the blood flow in the brain.  Additionally, they agreed that a reduced blood flow would indicate a functional impairment in that portion of the brain.

66.  Dr. Best and Dr. Pavel further agreed that the SPECT scan differed from an MRI because it was not designed to test the structure of the brain.

67.  According to Dr. Pavel, a patient may develop functional problems before an MRI can detect structural changes in the brain.

68.  After reviewing the SPECT scan, Dr. Pavel concluded that Kasim had a reduced blood flow in the frontal and temporal lobes of his brain.  These areas of the brain affect the executive functions such as decision making, planning, and the ability to

18

integrate information.  These areas also affect concentration and short-term memory.

69.  Dr. Pavel described the reduced brain function for Kasim as between moderate and marked.

70.  Dr. Pavel also disagreed with the opinion of Dr. Goldstein that Kasim's sleep apnea affected the SPECT results. According to Dr. Pavel, any problems caused by sleep apnea would affect the entire brain and not just the frontal and temporal lobes.

71.  Prior to his testimony, Dr. Best reviewed the SPECT test results with Dr. Hartman.

72.  Based upon his evaluation of Kasim, his conversations with Dr. Pavel and Dr. Hartman, and an interview with Etienne, Dr. Best concluded that Kasim was suffering from dementia caused by damage to his frontal and temporal lobes.

73.  Dr. Best also based his conclusion on the medical records of Porter Memorial Hospital.  Dr. Best concluded that Kasim was clinically dead for a few minutes and that a lack of oxygen caused brain damage.  Dr. Best described the tips of the frontal lobes as the most vulnerable to an injury caused by oxygen deprivation.

74.  Dr. Best concluded that Kasim was not competent to stand trial due to the dementia.  Because the dementia affects Kasim's perception of reality, Dr. Best concluded that Kasim "confabulates" to accommodate for his mental problems.

75. Although Dr. Best rejected the theory that sleep apnea has caused Kasim's mental problems, he did agree that fatigue caused by sleep apnea would aggravate these problems.

76. According to Dr. Best, a neuropsychologist such as Dr. Goldstein was not qualified to state an opinion on the effects sleep apnea has on brain function and also was not qualified to criticize the use of a SPECT scan by medical doctors.

77. Dr. John Shea, a board certified neurosurgeon, reviewed the SPECT scan at the request of the government. Before submitting a report to the government, Dr. Shea also consulted with Dr. Hacein-Bey, the Director of Neuroradiology at Loyola University.

78. In a letter dated July 2, 2008, Dr. Shea concluded:

> [T]here was marked decrease in both temporal lobes and significant decreased brain perfusion at the base of the frontal lobes. This would be compatible with problems with memory, learning, speech, and impulse control. There was also hyperfusion in the medial basal ganglia and thalamus which can be seen in depression, especially the dorsal median nucleus of the thalamus.
>
> We agree with the report that this gentleman did suffer significant cognitive loss as a result of his cardiac arrest. We have not reviewed the entire record. We reviewed only the SPECT scan.

79. After receiving the report from Dr. Shea, the government provided him with additional medical records of Kasim. On July 9, 2008, Dr. Shea participated in a telephone conference with

Diane Berkowitz, the Assistant U.S. Attorney assigned to the case, and two of the case agents.

80.   Dr. Shea testified at the hearing that he believed that the EEG, MRI, and SSEP test results, all of which were normal, were more important than the SPECT scan in determining whether Kasim suffered any brain damage as a result of the heart attack.

81.   Dr. Shea also testified that the SPECT scan was an objective test to measure blood flow in the brain.  He reiterated that the Kasim SPECT results showed a marked decrease in the blood flow for the temporal lobes.  Dr. Shea agreed that damage to these areas of the brain would affect the cognitive abilities of Kasim.

82.   Dr. Shea further testified that a patient can have normal results for an MRI and an EEG and still have a functional impairment of the brain.

83.   Dr. Shea reviewed the reports of Dr. Hartman, Dr. Best, and Dr. Pavel.  Dr. Shea agreed with these doctors that psycho-logical testing would produce invalid results if a patient has dementia.

84.   According to Dr. Shea, sleep apnea can cause brain damage and may have affected the SPECT results.

85.   After reviewing the additional medical records provided by the government, Dr. Shea did not have a second consultation with Dr. Hacein-Bey.

86.  Although Dr. Shea testified that he felt that the other tests were more important than the SPECT scan, he never changed the opinion which he stated in his July 2, 2008 letter.  In other words, Dr. Shea believed that "there was marked decrease in both temporal lobes and significant decreased brain perfusion at the base of the frontal lobes."

87.  Dr. Shea also testified that he did not have an opinion on whether Kasim was competent to stand trial.

88.  On December 8 and 15, 2007, Kasim was evaluated by Preston Harley who has a doctorate in neuropsychology.  Dr. Harley did not testify at the competency hearing, but his report was admitted into evidence.

89.  In the "background information" section, Dr. Harley noted that Kasim "reports that he no longer works other than conducting limited 'call work.'"

90.  Dr. Harley administered two effort tests to Kasim.  In the "effort" section of the report, Dr. Harley noted that "Kasim's performance was within the expected range for persons experiencing cognitive impairments."

91.  In the "summary" section, Dr. Harley concluded:

> On the basis of the above information and the
> current test findings, it is the opinion of
> this examiner that Dr. Kasim's current neuro-
> psychological profile is indicative of signi-
> ficant and permanent neurocognitive deficits.
> These impairments include: attention, memory,
> cognitive processing speed, executive skills
> of set shifting, planning, judgment and se-
> quencing.  Given he did not describe any

> problems or major difficulties in his prac-
> tice as a pediatrician prior to the 2003
> event described above in the report, these
> neuropsychological impairments are a conse-
> quence of his cerebral anoxic event.
>
> * * *
>
> The findings of the current neuropsychologi-
> cal examination support and confirm the con-
> clusions of Drs. Best and Hartman of severe
> vascular dementia, primarily involving the
> cerebral region of the frontal lobes.

92.  At the request of the government, Dr. Goldstein first examined Kasim on February 7, 2008.  In both her educational background and work experience, Dr. Goldstein has specialized in dementia patients.  Dr. Goldstein is the Director of Neuropsychology at the Isaac Ray Forensic Group.

93.  Because Kasim had broken his right wrist prior to the initial appointment, Dr. Goldstein could not resume the testing until May 20, 2008.  Dr. Goldstein met with Kasim a total of five times, and she completed her evaluation on June 3, 2008.

94.  Prior to formulating her opinion, Dr. Goldstein reviewed all of Kasim's medical records.  This included the Porter Memo-rial Hospital records concerning his heart attack, records for any physical problems Kasim had after his discharge from the hospital, and all of the records dealing with the mental evalua-tions of Kasim.

95.  Dr. Goldstein described Kasim as pleasant and coopera-tive at times and confrontational and provocative on other

occasions. She also indicated that in their conversations Kasim was articulate and fluent some of the time and rambling and difficult to understand on other occasions. Finally, she noted that Kasim's memory appeared to be intact at times when he remembered prior conversations but that on other occasions he claimed to have memory problems.

96. Kasim always was oriented as to dates and time and displayed a knowledge of current events both in news items and sports.

97. Dr. Goldstein performed a series of tests to measure Kasim's effort level. Dr. Goldstein also compared her test results with similar tests performed by Dr. Hartman. In her report, Dr. Goldstein concluded that "Kasim produced remarkably inconsistent and atypical test protocols, both psychological and cognitive." At the hearing, she testified that Kasim's effort was "problematic." Dr. Goldstein agreed with Dr. Hartman that the test results were not valid because of Kasim's effort level.

98. In her report, Dr. Goldstein stated that "malingering . . . cannot reasonably be ruled out." At the hearing, Dr. Goldstein reiterated that she could not rule out malingering by Kasim. At no time has Dr. Goldstein definitively stated that Kasim was malingering in her professional opinion.

99. In her report, Dr. Goldstein stated:

> Dr. Kasim also produced numerous *unimpaired* cognitive test performances, ranging from low to high average. In fact, without exception

24

> unimpaired performances were found in every
> domain of cognitive functioning assessed,
> including in the areas of general intellec-
> tual functioning, attention/concentration,
> learning and memory, visuospatial/visuoper-
> ceptual abilities, language, executive and
> motor functioning. (emphasis in original)

100.   At the competency hearing, Dr. Goldstein testified that Kasim had an I.Q. of 88.  She did not qualify that test result, nor did she explain how someone with an I.Q. of 88 could become a board certified pediatrician.

101.   Dr. Goldstein also testified that the SPECT scan, by itself, was not a valid basis for supporting a diagnosis of dementia.  She testified that the SPECT should be considered along with the results of an MRI or EEG, neuropsychological testing, and other forensic evidence.

102.   Dr. Goldstein agreed with the other medical experts that a normal MRI or EEG does not automatically mean that the brain is functioning normally.  She also stated that a lack of oxygen to the brain was likely to cause brain damage.

103.   In Dr. Goldstein's opinion, Kasim's main problem is sleep apnea.  Because of fatigue and daytime drowsiness, Kasim is experiencing problems with his memory and his concentration. These sleep apnea-related problems also precluded accurate testing by herself and Dr. Hartman.

104.   In her opinion, Kasim is competent to stand trial and assist in his defense.

105.   The American Academy of Neurology has issued a practice parameter entitled *Diagnosis of Dementia* (*an Evidence-Based Review*).   The study includes 10 practice recommendations concerning the diagnosis of dementia.   The recommendation relating to the SPECT scan states:

> For patients with suspected dementia, SPECT cannot be recommended for routine use in either initial or differential diagnosis as it has not demonstrated superiority to clinical criteria (Guideline).

> (Government Exh. 5, p. 6)

106.   In her report and at the hearing, Dr. Goldstein was critical of Dr. Best for relying upon the SPECT in his diagnosis of dementia.

107.   In his testimony concerning the practice parameters, Dr. Best again differentiated between structural and functional damage to the brain.   He agreed that the practice parameter would not apply if dementia was caused by structural damage to the brain.

108.   According to Dr. Best, he made a preliminary diagnosis of dementia and then ordered a SPECT scan to obtain additional information.   He testified that this was consistent with the practice parameters.

109.   Dr. Best also referred to another section of the study which states:

> SPECT and PET may be helpful in distinguishing [Frontal Temporal Dementia] from [Alzhei-

mer Disease].  Many patients with [Frontal
Temporal Dementia] show hypoperfusion of
anterior cerebral cortex with relative spar-
ing of posterior cortex with SPECT and PET.
In these four Class II studies, the highly
selected study participant pool makes it
difficult to generalize on the reported
specificities and sensitivities.  In patients
with cognitive or behavior deficits sugges-
tive of [Frontal Temporal Dementia], no stud-
ies addressed what additional value a SPECT
or PET scan provides.

(Government Exh. 5, p. 5)

110.  Dr. Kohn also disagreed with Dr. Goldstein's interpreta-

tion of the parameters.  According to Dr. Kohn, the parameters

focus on performing tests which are clinically and economically

justified.  As an example, Dr. Kohn indicated that performing a

SPECT scan on an elderly dementia patient might not be produc-

tive.

111.  To the extent that there is a conflict in the evidence,

the testimony of Dr. Kohn, a neurologist and neuropsychologist,

and Dr. Best, a neuropsychiatrist, is more convincing than the

testimony of Dr. Goldstein, a clinical psychologist.

112.  Prior to the competency hearing, case agents took state-

ments from several of Kasim's colleagues.  Before taking the

statements, the agents did not inform the witnesses that the

agents' primary concern was Kasim's mental state after his heart

attack.  Because all of the witnesses testified that Kasim was an

excellent pediatrician prior to his heart attack and well-liked

by the hospital staff, they attempted to portray Kasim in a favorable light when they responded to the agents' questions.

113. Sally Johnson is a registered nurse at Provident Hospital and worked in the maternity unit with Kasim. She was interviewed by government agents before she testified at the hearing.

114. Because Kasim primarily worked weekends, Johnson saw him only once or twice a month. Johnson testified that she did not see any signs of dementia in Kasim after his heart attack. However, she did state that Kasim appeared quieter and withdrawn after the heart attack.

115. Johnson also testified that she was aware of several incidents involving Kasim after his heart attack. On a number of occasions, Kasim would not respond to a page, and security would conduct a search for him. On one occasion, Kasim was found sleeping in his car.

116. Dr. Gayle Kates, the Chair of Pediatrics at Provident Hospital, also was interviewed by government agents and testified at the hearing.

117. Kasim primarily worked evenings, weekends, and holidays at Provident Hospital. Because Dr. Kates worked during the day, she rarely worked with Kasim. However, she saw Kasim and talked to him on a regular basis.

118. Dr. Kates was aware that Kasim did not respond to pages after his heart attack and that security found him asleep in his

car on one occasion.  Because of her concern for Kasim's health, Dr. Kates restricted his work hours but not his activities.

119.  Dr. Kates was responsible for all of the pediatricians with privileges at Provident Hospital.  She never saw any conduct which caused her to order a fitness exam for Kasim.

120.  Lisa Webb is a registered obstetrics nurse at Provident Hospital, and she gave a statement prior to the hearing.  On occasion, Webb called Kasim when she had a problem with her own baby.

121.  Webb worked as a nurse in the psychiatry ward for three years.  Although the patients in the psych ward were being treated for depression, not dementia, Webb had classes on dementia during her nursing education.

122.  Although Webb did not notice any signs of dementia in Kasim after his heart attack, she did notice that he moved slower and sometimes appeared to have difficulties making a decision.

123.  In her statement, Webb indicated that at times Kasim would stare "out in space."

124.  Because of her shift, Webb rarely saw Kasim unless she worked a double shift or on a weekend.

125.  Webb also was aware of complaints that Kasim would not respond to his pages and that on one occasion a security guard found Kasim sleeping in the doctor's lounge.

126.  Lois Martin is a registered nurse at Methodist Hospital. Because she is assigned to neurology patients, Martin has never worked with Kasim.

127.  Kasim was the pediatrician for Martin's children.  She saw Kasim on a regular basis prior to his heart attack and described him as an excellent pediatrician.

128.  Prior to his heart attack, Kasim always returned Martin's phone calls and even called her to check on the progress of her children.

129.  After the heart attack, Martin had problems reaching Kasim, and he did not return her telephone calls.

130.  Kasim and Martin live in the same subdivision.  On one occasion, Martin took one of her children to Kasim's home for a sports physical.  Kasim was in his pajamas and appeared fatigued.

131.  At times, Martin saw Kasim in the hospital after his heart attack.  He often appeared disheveled and had problems remembering the names of her children.  This was a noticeable change in his demeanor.

132.  Martin continued to take her children to see Kasim for a period of time after his heart attack.  She testified that Kasim only saw her children for routine matters, and that as a registered nurse, she felt that she would recognize an improper diagnosis.

133.  Julie Gilbert is a registered nurse at Methodist Hospital.  Kasim was the pediatrician for her children.

134. Prior to his heart attack, Gilbert described Kasim as an "amazing" pediatrician who was interested in her children and attentive to their problems.

135. Gilbert continued to take her children to see Kasim after his heart attack. She described him as a changed person who appeared disinterested and had poor eye contact. She also noticed that Kasim did not interact with her children as he had prior to the heart attack.

136. Over the objection of the government, Purdom testified concerning his contacts with Kasim. Purdom was retained by Yaser Kasim ("Yaser"), the younger brother of Kasim.

137. Yaser brought Kasim to the initial appointment. In order to preserve the attorney/client privilege, Purdom first met only with Kasim. He instructed Yaser to remain in the waiting room.

138. After about ten minutes, Purdom asked Yaser to join the meeting to assist him in interviewing Kasim. According to Purdom, Kasim was rambling and unresponsive to his questions.

139. Kasim has called Purdom on a number of occasions to suggest a defense strategy. The suggested strategies were not helpful, and on a number of occasions, they echoed previous telephone calls from Kasim.

140. To date, Purdom has not received any substantive information from Kasim which he believes comes within the scope of the attorney/client privilege.

141.   The government complied with its obligations under Federal Rule of Criminal Procedure 16 and provided Purdom with discovery relating to the Medicaid fraud included in the indictment along with the casino-based ATM receipts for that time period.  However, the government did not provide Purdom with information relating to the Medicaid fraud and gambling losses in 2002 and 2003.

142.   At the competency hearing, Purdom questioned a number of witnesses concerning the fraud and gambling which occurred after the heart attack.  His questions were designed to elicit testimony that the post-heart attack fraud and gambling reflected a personality change in Kasim.

143.   The government introduced evidence of the pre-heart attack fraud and gambling through its last witness, case agent Lisa Sweatland.

144.   Purdom is a former Assistant U.S. Attorney who now specializes in defending white collar crime.  Both his pleadings and his conduct during the competency hearing suggest that he is a skillful and conscientious attorney.

145.   The fact that Purdom walked into the trap set by the government confirms his testimony that he has not been able to obtain important information on the merits of the case from Kasim.

146.   Yaser testified concerning his relationship with his brother both before and after the heart attack.  He described Kasim as a workaholic who always was well-dressed.

147.   Yaser noticed a difference in Kasim after he emerged from the coma.  Kasim moved and talked more slowly and refused to seek additional medical attention.

148.   Yaser attended the entire hearing and testified that he retained both Dr. Kohn and Purdom to assist Kasim.  In spite of these efforts, Kasim has been distrustful of Yaser and has accused Yaser of conspiring against him.

149.   Yaser also testified that he cannot get accurate information from Kasim, that Kasim mumbles and is incoherent at times, and that Kasim frequently raises topics which have been discussed on many prior occasions.

150.   Yaser further testified that Kasim handled his own hygiene, cooked, drove, and used the internet.

151.   Kasim was present for the entire competency hearing.  Although he sat at counsel table, he never attempted to discuss any of the proceedings with Purdom.

152.   Kasim appeared disinterested and never looked at the witnesses, the attorneys, or the court during the hearing.  Most of the time, he had his face buried in his hands or his head down resting on his arms.

153.   On at least two occasions, Kasim fell asleep during the proceedings.  On one of these occasions, Berkowitz noted for the

record that Kasim was asleep.  In response, Purdom acknowledged that Kasim was asleep but stated that the hearing could continue because Kasim was not providing him any assistance.

154.  During the final arguments, Berkowitz conceded that the court was entitled to rely on its observations of Kasim in formulating an opinion as to Kasim's competency.

## Discussion

### Authority of Magistrate Judge

28 U.S.C. § 636(b)(1)(A) authorizes the designation of a magistrate judge "to hear and determine any pretrial matter pending before the court" with certain exceptions not applicable here.  This section allows the district judge to reconsider a magistrate judge's order if it appears to be "clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A).  The Northern District has adopted a Dispositive Logic Table designating the assignment of motions between the magistrate judges and the district judges who preside over the cases.  That Table desig-nates orders of competency to stand trial in criminal cases as non-dispositive and authorizes the magistrate judge to rule on such motions, with the understanding that the presiding district judge may review that decision under the standards of subpara-graph A.  *See, e.g., United States v. Nance*, 116 F.3d 1483 (7th Cir. 1997)(discussing a magistrate judge's finding of compe-tency); *United States v. Shrake*, 2006 WL 6021176 (W.D. Wis. 2006) (affirming the magistrate judge's finding of competency).  *See*

*also **United States v. Battle***, 264 F.Supp.2d 1088, 1107-08 (N.D. Ga. 2003)(affirming a magistrate judge's finding of competency and differentiating between review of subparagraph A and B).

## Competency of Kasim

"Unquestionably, due process requires a defendant to be competent to stand trial." ***United States v. Andrews***, 469 F.3d 1113, 1117 (7th Cir. 2006)(*quoting **United States v. Collins***, 949 F.3d 921, 924 (7th Cir. 1991)). *See also **Cooper v. Oklahoma***, 517 U.S. 375, 384-85, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996)(noting that the Supreme Court has "repeatedly and consistently recognized that the criminal trial of an incompetent defendant violates due process." (internal quotation and citation omitted); ***Eddmonds v. Peters***, 93 F.3d 1307, 1314 (7th Cir. 1996)("The Constitution forbids trial of one who, for whatever reason, is unfit to assist in his own defense because our adversarial system of justice depends on vigorous defenses."). A criminal defendant at any time after the return of an indictment and prior to sentencing may file a motion for a hearing to determine mental competency to stand trial. 18 U.S.C. § 4241(a). Upon such motion

> [t]he court shall grant the motion . . . if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

> 18 U.S.C. § 4241(a)

*See also* **Woods v. McBride**, 430 F.3d 813, 817 (7th Cir. 2005)("A defendant is entitled to a hearing on his competency if a bona fide doubt arises about his ability to consult with his attorney or his understanding of the charges brought against him." (*citing* **Drope v. Missouri**, 420 U.S. 162, 180, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); **Pate v. Robinson**, 383 U.S. 375, 385, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966)).

To be competent, a court must determine whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." **Dusky v. United States**, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960). *See also* **Woods**, 430 F.3d at 817 (articulating same standard for competency); **United States v. Jones**, 87 F.3d 954, 955 (7th Cir. 1996)(same); **United States v. Spencer Jones**, 83 F.3d 927, 928 (7th Cir. 1996)(same). There is a presumption that a criminal defendant is mentally competent to stand trial. **United States v. Teague**, 956 F.2d 1427, 1431 (7th Cir. 1992) However, once the issue of a defendant's mental competency is raised, the government bears the burden of proving by a preponderance of the evidence that the defendant is competent to stand trial. **United States v. Salley**, 246 F.Supp.2d 970, 976 (N.D. Ill. 2003) (*citing* **Teague**, 956 F.2d at 1432 n.10; **United States ex rel S.E.C. v. Billingsley**, 766 F.2d 1015, 1023-24 n.10 (7th Cir. 1985); **United States ex rel. Bilyew v. Franzen**, 686 F.2d 1238, 1244 (7th Cir. 1982).

Testimony of credible and well-informed physicians has demonstrated that Kasim has difficulty communicating with others, whether such difficulty is based on problems with word-finding, rambling speech that is hard to understand, or a tendency to convey inaccurate information. (See Facts 21, 32, 36, 53, 74) These communication problems are magnified by Kasim's paranoia, likely brought on by his poor judgment and comprehension skills. (See Facts 43, 148) Purdom's problems in representing Kasim were illustrated by several incidents during this hearing. Kasim's overall behavior demonstrated a complete lack of interest in the proceedings and an absence of any communications with Purdom. (See Fact 151) This lack of affect included various informal postures taken in which Kasim's face was covered or his head was down on the table, and he also slept through portions of the proceedings. (See Fact 152) Purdom was surprised that similar fraudulent acts occurred *before* Kasim's heart attack. This undermined his strategic position throughout the hearing and highlighted the fact that Kasim is unable to consult with his attorney. (See Fact 151)

Next, it must be determined whether Kasim presently has a rational and factual understanding of the proceedings against him. As to his rational capabilities, Kasim's mental deficiencies were well-documented. After surviving his first myocardial infarction and subsequent coma, his treating physician noted a cognitive dysfunction, later classified as an early indication of dementia. (See Facts 22, 39) Kasim's demeanor during various

37

medical evaluations portrayed poor judgment, an inability to
concentrate, and an inability to understand the charges at hand.
(See Facts 41, 44, 45, 52)  The objective SPECT scan supports
these symptoms and represents objective evidence of a medical
disability caused by a functional impairment in Kasim's front
temporal lobes.  This scan corresponds to the diagnoses of
vascular dementia from four testifying medical specialists.  (See
Facts 34, 44, 45, 64, 72, 78, 81, 83, 86, 91)  Moreover, the
testimony of Kasim's co-workers showed a once competent pediatri-
cian (See Facts 120, 127, 128, 134), now a withdrawn, somnolent,
indecisive, and disinterested man.  (See Facts 114, 115, 122,
125, 130, 131, 135)

On the other hand, Kasim had the mental capacity not only to
commit the crimes charged but also to perform his duties as a
pediatrician and to pass his medical board re-certification exam.
(See Facts 12, 28) These acts suggest that Kasim may have re-
tained the functional capacity necessary to understand these
criminal proceedings.  However, there is a difference between
frontal lobe dementia's  effects on judgment and comprehension
and its lack of effect on preserved memory.  The credible evi-
dence offered by medical specialists supports a finding that the
progression of dementia affects reasoning and complex behaviors
and may not affect memory and physical capabilities formed over
decades.  This difference explains the successful re-certifica-
tion exam performance and prevents it from becoming decisive.
(See Fact 42)  In addition, the witnesses who questioned Kasim's

ability to practice medicine support a belief that though he was able to perform routine matters, he was not performing mentally at a level commensurate with his prior abilities. (See Facts 23, 35, 114, 115, 122, 125, 130, 131, 135)

To determine whether the government has met its burden by a preponderance of the evidence, both the quality and the quantity of evidence must be considered. The expert opinions offered supporting a finding of incompetency both outnumbered and out-weighed the single expert offered by the government. From the time of his cardiac infarction, Kasim was found to have suffered brain damage due to a lack of oxygen supply to his brain. (See Facts 7, 10, 91) The repeated diagnoses of dementia by four of the physicians called to testify, which included input from at least two other medical specialists, were highly convincing. One of the specialists considered Dr. Goldstein's report, yet still held to his dementia diagnosis, while another specialist stated that Dr. Goldstein, a neuropsychologist, was not qualified to offer an opinion on the use of SPECT analysis because it was a medical imaging technique outside her expertise. (See Facts 38, 76, 111) Both Dr. Shea and Dr. Harley concurred in the belief that the cognitive impairment/dementia in question likely would result in inconsistent results in psychological tests. (See Facts 83, 90)

The government asserts that any of Kasim's mental deficien-cies are a result of sleep apnea and his refusal to treat the apnea with his CPAP. However, Dr. Goldstein failed to support

her diagnosis of sleep apnea and to explain the functional loss demonstrated through objective testing. (See Facts 49, 50, 70) Dr. Goldstein agreed that anoxia could cause brain damage and that a SPECT scan can reveal functional deficiencies invisible to an MRI or EEG, which only reveal structural deficiencies. (See Fact 102) However, Dr. Goldstein believed that the use of SPECT was inappropriate for a dementia diagnosis. (See Fact 105) Dr. Goldstein's interpretation of the clinical guidelines for the use of a SPECT scan is misplaced: the guideline in question suggests practical applications of the SPECT scan to help physicians allocate medical and financial resources. (See Fact 109) As such, her dismissal of the use of the objective test which displayed a marked decrease in the blood flow to Kasim's frontal temporal lobes must be disregarded. Rather, it appears that a progressive degenerative impairment of Kasim's cognitive abilities is influencing his every decision, including those involved with his own treatment.

As for the government's contention that Kasim is malingering, the court considers the DSM-IV0:

> Malingering should be strongly suspected if any combination of the following is noted:
>
> 1. Mediocolegal context of presentation (e.g., the person is referred by an attorney to the clinician for examination);
> 2. Marked discrepancy between the persons' claimed stress or disability and the objective findings;

3. Lack of cooperation during the diagnostic evaluation and in complying with the prescribed treatment regimen;

4. The presence of Antisocial Personality Disorder.

DSM-IV0 at p. 683

*See, e.g.,* ***United States v. O'Kennard***, 2004 WL 1179391 at *3-4 (N.D. Ill. 2004) (applying the DSM criteria).

As to the first criterion, there was a consistency of opinion among both physicians retained by defense counsel and those who Kasim consulted without any reference to the criminal charges. Notably, Drs. Alnahass and Kohn evaluated Kasim without any knowledge of his indictment. In addition, Dr. Shea, who also found a marked decrease in functional brain activity, was hired by the government to review the SPECT scan and Kasim's other medical records. As to the second criterion, the objective findings, most notably the SPECT scan, explain any inconsistencies in the psychological test results and support a finding that they were caused by Kasim's dementia. Dr. Goldstein described Kasim as "pleasant and cooperative at times and confrontational and provocative on other occasions," declaring his effort at testing to be "problematic." (See Facts 95, 97) She refused to rule out malingering, but she never definitively stated that he was a malingerer. Likewise, though Kasim has not cooperated in the CPAP treatment of his sleep apnea, this behavior is more consistent with the symptoms of dementia itself, including his

blunted affect, his impaired insight and judgment, and modifica-
tions in his responses. Kasim's problems may be caused by co-
morbidity, and the confluence of symptoms of mental dysfunction
likely overlap, but sleep apnea treatment alone would not improve
his overall mental condition. Therefore, the third criterion is
not found to be present, and the court cannot agree that Kasim is
a malingerer.[2]

There was testimony that Kasim was malingering. However,
Dr. Kohn testified that Kasim would have to be a "consummate
actor" to pull off such a long and consistent performance of
cognitive dysfunction. (See Fact 54) Dr. Hartman stated that
while Kasim's intent was to magnify his mental deficits, such
exaggerated results and confabulation were indicative of frontal
brain cerebrovascular disease, and not malingering, and required
further investigation, namely the SPECT scan. (See Facts 57-59)
Likewise, Dr. Harley's effort tests depicted poor effort by
Kasim, but such performance was expected for a patient with a
cognitive impairment. (See Fact 90) These corresponding opin-
ions are accepted as outweighing the opinion of Dr. Goldstein
that malingering "cannot reasonably be ruled out." (See Fact 98)

Kasim's poor judgment and lack of cooperation with defense
counsel are the result of the progressive debilitating disease of
dementia. Kasim lacks the necessary ability to consult with his
counsel and the rational understanding of the proceedings here.

---

[2]There was no evidence introduced concerning Antisocial Personality
Disorder.

42

As such, he is incompetent to stand trial. Given the undisputed testimony that dementia is a progressive disease, it appears unlikely that Kasim will regain the necessary ability to stand trail.

The period of delay resulting from the competency evaluation of Kasim is to be excluded under 18 U.S.C. § 3161(h)(1)(A). *See, e.g., Nance*, 116 F.3d at 1483 (affirming exclusion of time attributable to competency determination). The period of delay resulting from Kasim's pretrial motion through the disposition of that motion is to be excluded under 18 U.S.C. § 3161(h)(1)(D) (formerly 3161(h)(1)(F)). *See, e.g., United States v. Morgan*, 384 F.3d 439, 442 (7th Cir. 2004) (excluding time spent in filing and resolution of pretrial motions). The period of delay resulting from this order is to be excluded under the terms of the Speedy Trial Act and 18 U.S.C. 3161(h)(4). *See, e.g., United States v. Neville*, 82 F.3d 750, 763 (7th Cir. 1996)(finding time excludable due to competency issues).

————————————

For the aforementioned reasons, the Second Motion for Ruling as to Competency filed by the defendant, Jihad Kasim, on May 16, 2008, is **GRANTED.**

ENTERED this 3rd day of November, 2008

                    s/ ANDREW P. RODOVICH
                       United States Magistrate Judge