UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | CAUSE NO. 2:07 CR 56 |
| | ) | |
| DR. JIHAD KASIM | ) | |

## OPINION AND ORDER

This matter is before the court on the hearing pursuant to 18 U.S.C. §§4241(e) and 4247(d) to determine the competency of the defendant, Dr. Jihad Kasim, to stand trial. The court now makes the following findings of fact, to be considered as supplemental to the earlier findings of fact in this court's Opinion and Order of November 3, 2008, DE 119.

### Findings of Fact

1. Dr. Charles DeCarli, a board certified neurologist, is qualified to render an expert opinion as to whether Kasim suffers from any form of dementia that would render him incompetent to stand trial.

2. Dr. DeCarli testified that under the American Academy of Neurology (AAN) parameters for diagnosing dementia, the starting point is the history. An assessment must be made of the patient's cognitive ability. This is part of a clinical exam and requires cooperation on the part of the patient. A patient's unwillingness to cooperate for any reason may render that part of the exam unreliable and uninformative. Confronted with an

unreliable history, other measures must be considered, specifically biological markers.

    3.    Dr. DeCarli testified that as a diagnostician, he would want to know whether a person being examined for dementia was under federal indictment and was petitioning the court to be declared incompetent to stand trial, because such facts should be factored into the diagnosis.

    4.    According to Dr. DeCarli, the reliability of information given by family members also would be called into question when the patient is under federal felony indictment.

    5.    Dr. DeCarli testified that since 2001, a SPECT scan has been considered an unreliable biological marker of dementia. SPECT measures blood flow in the brain, and that blood flow can change as much as 25% depending on the state of the individual and the resolution of the imaging.

    6.    In Dr. DeCarli's opinion, a board certified neurologist stating in 2008 that AAN practice parameters included use of SPECT in diagnosing dementia would be incorrect, and such a statement would, in fact, show ignorance of the current scientific methods of dementia diagnosis.

    7.    Dr. DeCarli explained that FDG-PET measures sugar consumption of the brain and that the health of brain tissue is proportional to the amount of sugar used per minute by brain tissue. FDG-PET allows a physician to look at the function of brain tissue and demonstrates dementia by showing a reduction in glucose metabolism as a change in the color of the brain image.

8.  Dr. DeCarli testified that FDG-PET and MRI are the two diagnostic tools to be used in the evaluation of a patient for dementia whereas SPECT is not the tool of choice, but should be used only if the other two methods of testing are unavailable.

9.  According to Dr. DeCarli, the diminished blood flow shown on Kasim's SPECT scan images could be attributable to hypertension but is not indicative of frontal temporal dementia.

10. Dr. DeCarli concluded that the tests of Kasim show no biological markers of frontal temporal dementia, anoxic encephalopathy, or any other neurological brain disorder.

11. Dr. DeCarli stated that it would be highly unusual for someone to exhibit outward signs of dementia while having no biological indication of the disease.  In addition, Dr. DeCarli said that given Kasim's assertion that the onset of his dementia was in 2003, he would expect to see some kind of biological marker in the brain imaging that took place in 2008 if dementia were present.

12. Dr. DeCarli indicated that a person diagnosed with frontal temporal dementia in 2003, by the end of 2009, would be severely impaired, unable to care for himself, unable to dress himself, incontinent, unable to discern food from other foreign objects, and would exhibit brain changes evident on MRIs and PETs.

13. In forming his opinion, Dr. DeCarli relied on the observations made by Dr. Robert Denney while Kasim was incarcerated at the federal medical facility.  Dr. DeCarli stated that Kasim's

behavior at the facility provides evidence of normal functioning, rather than the inability to learn new tasks and the decline of acquired abilities that would be expected from a patient with dementia.

14. Dr. DeCarli believed that Kasim recovered from anoxic encephalopathy as evidenced by his return to work and the successful board re-certification exam in 2007. Dr. DeCarli stated that it would be impossible for a patient with dementia to possess the cognitive ability necessary to pass such a test. A 79% pass rate on the pediatric board re-certification test is not consistent with frontal temporal dementia or anoxic encephalopathy.

15. According to Dr. DeCarli, recovery from anoxic encephalopathy would not be followed by degeneration. Rather, the damage would be known within days of the anoxic event. Kasim recovered from his anoxic event and had a normal EEG and MRI before his discharge from the hospital. Dr. DeCarli testified that there is no evidence of any residual effects of the anoxic event associated with Kasim's 2003 heart attack.

16. Dr. DeCarli stated that a review of Kasim's medical records, including a neurological exam administered by Dr. Chuang-Kuo Wu on September 17, 2009, reveal repeated normal neurological results. This is inconsistent with the claimed functional impairment claimed by Kasim.

17. Dr. DeCarli testified that depression does not have a structural or functional consequence on the brain and does not show up on an MRI or PET scan.

18. In Dr. DeCarli's opinion, the ecological validity tests conducted by Dr. Denney in the prison medical facility are scientifically valid and tested Kasim's cognitive ability. Kasim's placement in a new environment and his ability to function in that environment are relevant factors in his diagnosis.

19. Dr. DeCarli testified that Kasim's discussions with counsel on the phone concerning upcoming MRI and PET scans demonstrated an awareness of his external environment and of the possible legal issues posed by the tests. This behavior, as well as the decision to stand down when confronted by the extraction team in the prison, demonstrate an analytical analysis of his situations.

20. It is the opinion of Dr. DeCarli that there is both clinical neuropsychological data and biological data to conclude that Kasim does not suffer from a degenerative dementia. Dr. DeCarli did not find sufficient evidence from the studies conducted on Kasim to conclude that he suffers from any detectable brain injury. Dr. DeCarli agrees with Dr. Denney that Kasim is competent to stand trial.

21. Dr. Mahmood Alnahass is a board certified neurologist who saw Kasim twice in 2006 and once in 2007. Dr. Alnahass stated that he did not diagnose Kasim with dementia. He explained that the word "diagnosis" as used in his reports intro-

duced at the prior competency hearing was his initial impression and was based on the information told to him by Kasim. Dr. Alnahass testified that he never would diagnose dementia based solely on the self-reported information from the patient.

22. BOP Officer Gary Gregg testified that while incarcerated at the federal prison medical facility in January 2009, Kasim was required to navigate a four-story building on his own and successfully traveled from his unit to the receiving and discharge area of the facility to be taken to the hospital for medical tests. Gregg did not observe Kasim throughout this journey, but he noted that Kasim made it to his destination unescorted by any attendant.

23. Gregg testified that on January 9, 2009, upon notification that he was to be taken to a local hospital for MRI and PET scans, Kasim advised Gregg that he would not go until he spoke to his brother and his lawyer.

24. Dr. Denney evaluated Kasim at the federal prison medical center and determined that Kasim was competent to stand trial and that Kasim is malingering. These conclusions were based on Dr. Denney's observations and conversations with Kasim and the administration of 29 different neuropsychological tests.

25. Dr. Denney testified that Kasim's neuropsychological test results show that from the beginning of the testing process, Kasim was grossly exaggerating his cognitive impairment and that as he received feedback on his test performance, he continued to adjust it. Dr. Denney stated that evidence that Kasim later

6

passed malingering tests which he previously had failed was highly unusual and unlikely to occur in a patient with dementia.

26. Dr. Denney reported on observations of Kasim by the BOP nursing and guard staff which indicated that Kasim was not cognitively impaired.

27. Dr. Denney testified that while in BOP custody, Kasim regularly showered, dressed, and shaved himself, and there were no incidents of Kasim wandering aimlessly in the facility.

28. According to Dr. Denney, Kasim showed the ability to communicate with his lawyer and to assist in his own defense, as evidenced by his desire to confer with his lawyer before going to a local hospital for MRI and PET scans. Dr. Denney referred to recorded phone conversations of Kasim discussing his situation with his lawyer and his brother.

29. After his release from the prison hospital, Kasim went to the hospital to obtain results of the tests performed there. Dr. Denney testified that Kasim's ability to recall the name of the local hospital where his scans took place and to procure his test results from the staff demonstrated that Kasim is not demented, has no cognitive disability, and is aware of the criminal matter pending.

30. Dr. Wu testified that on September 17, 2009, Kasim and his brother, Imad, asked him for a second opinion on Kasim's diagnosis of dementia. Dr. Wu stated that at no time did Kasim or his brother mention the federal indictment or the competency hearings.

31.  Dr. Wu testified that he administered a neurological exam, MRI, blood test, and EEG to Kasim for diagnostic purposes, and all of these test results were normal.  Dr. Wu stated that he also administered a mental status exam, and that test yielded abnormal results.  Dr. Wu did not find that this abnormal result supported a diagnosis of any cognitive disorder in light of the other test results.

32.  Dr. Wu agreed with Dr. DeCarli that SPECT is not a recognized tool to diagnose dementia because of its unreliability.  Dr. Wu recognized Dr. DeCarli as an expert in the field of dementia.

33.  Dr. Hazen Ham, the vice president of the American Board of Pediatrics ("ABP"), testified that on October 30, 2006, Kasim successfully completed the on-line application to the ABP for its maintenance of certification examination, previously referred to as the re-certification examination.  This process involved the creation of a personal account including credit card information, use of a unique password, and completion of the application.

34.  Dr. Ham testified that once the application was completed, Kasim was required to send the ABP his license information, and then he received instructions to contact the vendor that administers the ABP test.  Kasim successfully completed these steps and navigated the vendor's website to make arrangements to sit for the exam.

35.  Dr. Ham testified that the ABP exam was proctored and that Kasim had to produce a photo identification to be admitted

to the examination room.  Kasim completed the exam which tested 30 to 34 areas of pediatric knowledge and was informed in April 2007 that he passed with a 79% grade.  The average result for that test was 84%, and the minimum grade for certification was 70%.

36.  Dr. Ham testified that the purpose of the exam was to measure a physician's current medical knowledge and his ability to reason clinically, requiring the physician to keep up with current medical information by means of continuing education classes or reading professional journals.

37.  Audiotapes of phone calls made by Kasim were entered into evidence.  The recordings reveal that Kasim was coherent, lucid, capable of analytical thinking and planning, and able to communicate his concerns and ideas to others.

## Discussion

28 U.S.C. §636(b)(1)(A) authorizes the designation of a magistrate judge "to hear and determine any pretrial matter pending before the court" with certain exceptions not applicable here.  This code section allows the district judge to reconsider this court's order if it appears to be "clearly erroneous or contrary to law."  28 U.S.C. §636(b)(1)(A).  The Northern District has adopted a Dispositive Logic Table designating the assignment of motions between the magistrate judges and the district judges.  That Table designates as non-dispositive orders of competency to stand trial in criminal cases and authorizes the assigned magistrate judge to decide those motions, with the

9

understanding that the presiding district judge may review under the standards of subparagraph A.  *See, e.g., United States v. Nance*, 116 F.3d 1483 (7th Cir. 1997)(discussing a magistrate judge's finding of competency); *United States v. Shrake*, 2006 WL 6021176 (W.D. Wis. 2006) (affirming the magistrate judge's finding of competency).  *See also United States v. Battle*, 264 F.Supp.2d 1088, 1107-08 (N.D. Ga. 2003) (affirming a magistrate judge's finding of competency and differentiating between review of subparagraph A and B).

"Unquestionably, due process requires a defendant to be competent to stand trial." *United States v. Andrews*, 469 F.3d 1113, 1117 (7th Cir. 2006)(*quoting United States v. Collins*, 949 F.3d 921, 924 (7th Cir. 1991).  *See also Cooper v. Oklahoma*, 517 U.S. 375, 384-85, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) (*noting* that the Supreme Court has "repeatedly and consistently recognized that the criminal trial of an incompetent defendant violates due process." (internal quotation and citation omitted); *Eddmonds v. Peters*, 93 F.3d 1307, 1314 (7th Cir. 1996) ("The Constitution forbids trial of one who, for whatever reason, is unfit to assist in his own defense because our adversarial system of justice depends on vigorous defenses.").  A criminal defendant at any time after commencement of a prosecution for an offense and prior to sentencing may file a motion for a hearing to determine mental competency to stand trial.  18 U.S.C. §4241(a).  Upon such motion:

> [T]he court shall grant the motion . . . if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.
>
> 18 U.S.C. §4241(a)

*See also* **Woods v. McBride**, 430 F.3d 813, 817 (7th Cir. 2005)("A defendant is entitled to a hearing on his competency if a bona fide doubt arises about his ability to consult with his attorney or his understanding of the charges brought against him." (*citing* **Drope v. Missouri**, 420 U.S. 162, 180, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); **Pate v. Robinson**, 383 U.S. 375, 385, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966)).

To be competent, a court must determine whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." **Dusky v. United States**, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960). *See also* **Woods**, 430 F.3d at 817 (articulating same standard for competency); **United States v. Jones**, 87 F.3d 954, 955 (7th Cir. 1996)(same); **United States v. Spencer Jones**, 83 F.3d 927, 928 (7th Cir. 1996)(same). There is a presumption that a criminal defendant is mentally competent to stand trial. **United States v. Teague**, 956 F.2d 1427, 1431 (7th Cir. 1992). However, once the issue of a defendant's mental competency is raised, the government bears the burden of proving

11

by a preponderance of the evidence that the defendant is competent to stand trial. ***United States v. Salley***, 246 F.Supp.2d 970, 976 (N.D. Ill. 2003)(*citing* ***Teague***, 956 F.2d at 1432 n.10; ***United States ex rel S.E.C. v. Billingsley***, 766 F.2d 1015, 1023-24 n.10 (7th Cir. 1985); ***United States ex rel. Bilyew v. Franzen***, 686 F.2d 1238, 1244 (7th Cir. 1982).

Extensive evidence was introduced at both the prior competency hearing and at this hearing. Although the previous evidence and testimony led the court to find that Kasim had difficulty communicating with others, including his attorney, the government has provided more than sufficient evidence that Kasim is competent to stand trial. The testimony of Dr. Denney about his conversations with Kasim, along with the staff observations and audio tapes of phone calls, are a clear indication that Kasim has no impediment to discussing his case with his counsel, his brother, or anyone he chooses.

Kasim presently has a rational and factual understanding of the proceedings against him. Although Kasim has portrayed himself to be mentally deficient, he was able to navigate new environments and adjust his personality when it suited him. The process that Kasim successfully completed to sign up for and complete his ABP maintenance certification examination displays a high level of rational capabilities. Although at the previous hearing the government failed to meet its burden, the evidence offered after Kasim's stay at the prison hospital clearly demonstrates no physical or psychological evidence of dementia.

Previously, the expert opinions offered supporting a finding of incompetency both outnumbered and outweighed the single expert offered by the government. However, the closer study of Kasim in the BOP medical facility combined with the more accurate medical testing has overcome the prior evidence supporting incompetency. As for the government's contention that Kasim is malingering, the subsequent evidence – most notably the behavior of Kasim when he left the BOP facility and retrieved his test results at the local hospital and when he was recorded during phone conversations – displays a marked difference in Kasim's behavior when he does not think he is being observed, a likely indication of malingering.

The government having met its burden of a preponderance of the evidence with the uncontroverted evidence presented at this hearing, the court finds Kasim competent to stand trial.

ENTERED this 21st day of January, 2010

                                                s/ ANDREW P. RODOVICH
                                                  United States Magistrate Judge